O'CALLAGHAN et al. v. O'BRIEN et al.

(Circuit Court, D. Washington, N. D.   July 8, 1902.)

No. 943.

1. JURISDICTION OF FEDERAL COURTS—PENDENCY OF SUIT IN STATE COURT.
    In a case of which, by the constitution and laws of the United States, a federal court is given jurisdiction concurrent with the jurisdiction of a state court, the parties have an absolute right to invoke that concurrent jurisdiction, and the court has no right to refuse them a hearing because of the pendency of a prior suit in a state court, between the same parties, for the same cause of action.

2. SAME—SUIT TO ESTABLISH RIGHTS AS HEIRS.
    A federal court has jurisdiction of a suit by aliens to establish their relationship to a decedent and their status as heirs, and to determine the validity of a will under which a citizen of the state claims the estate, notwithstanding the pendency of probate proceedings in the state court, and although there are other persons claiming an interest in the estate who are not parties.

3. DEPOSITIONS—ISSUANCE OF FOREIGN COMMISSION—DISCRETION OF COURT.
    In a suit by aliens who were residents of Ireland, to establish their kinship to a decedent, the court issued an open commission authorizing the examination in Ireland of witnesses who might be called by either party. After its return with the depositions taken thereunder, defendants moved for a new commission to take additional testimony in Ireland, on interrogatories to disprove complainants' claim to relationship. On the suggestion of the court, affidavits of the proposed new witnesses were submitted in support of the application, setting out the substance of the facts to which they would testify. From these it appeared that their testimony would not directly contradict that of complainants' witnesses in any material matter, and that it would make as strongly for as against complainants, and, if taken, could not affect the decision. Held that, under such circumstances, the parties should not be burdened with the expense and delay entailed by the issuance of a second commission.

4. DESCENT—CLAIMS TO HEIRSHIP—EVIDENCE TO SUSTAIN.
    It is necessary for persons residing in a distant land, claiming a valuable estate situated in this country as collateral heirs of the decedent, to make out their case by convincing proof, and the court should be cautious in reaching a conclusion favorable to such claims. Still, where there is positive and direct testimony of numerous witnesses, who are disinterested, and who had opportunity to know the facts to which they testify, corroborated by circumstances and by records to such an extent as to compel a belief in its general accuracy, all of which supports the case of the claimants, it cannot be rejected merely because of errors of some of the witnesses, in immaterial matters, which may reasonably be attributed to inaccuracy in the recollection of events long past.

5. NUNCUPATIVE WILL—VALIDITY—EVIDENCE TO ESTABLISH.
    The lawful heirs of a decedent should not be deprived of their right of inheritance by a nuncupative will unless the prescribed forms of law

¶ 1. Conflicting jurisdiction of federal and state courts, see notes to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.

See Abatement and Revival, vol. 1, Cent. Dig. § 87; Courts, vol. 13, Cent. Dig. §§ 1346, 1349.

for establishing such will have been carefully observed and strictly conformed to, nor unless it be proved to be genuine by evidence strong enough to convince an unprejudiced mind that the necessary words were spoken by the testator with the intent thereby to make a testamentary disposition of his property.

6. SAME.

Evidence to establish a nuncupative will disposing of an estate of $500,000, consisting solely of the testimony of the beneficiary and her three nearest relatives, all of whom testified exactly alike as to the words spoken and as to the understanding of the witnesses as to the testator's meaning, further weakened by the fact that each subsequently corrected his or her testimony as to such understanding in exactly the same manner, is not sufficiently convincing to warrant a court in sustaining such will to the exclusion of the next of kin of decedent.

7. SAME—PROVING UNDER WASHINGTON STATUTE—NECESSITY OF CITATION.

1 Ballinger's Ann. Codes & St. Wash. § 4606, providing that "no proof shall be received of any nuncupative will unless it be offered within six months after speaking the testamentary words, nor unless the words or the substance thereof be first committed to writing, and a citation issued to the widow or next of kin of the deceased that they may contest the will if they think proper," is mandatory, and contemplates the issuance of a citation a sufficient length of time before the hearing to afford parties adversely interested a reasonable opportunity to appear and contest the will; and a decree admitting to probate an alleged nuncupative will was without jurisdiction and void where it was entered on the same day the petition was presented, on a citation then issued, and immediately returned without service, which citation named as the time for hearing an hour which was then past.

Suit in equity by subjects of the king of Great Britain, residing in Ireland, for a decree establishing their rights as the legal heirs of John Sullivan, deceased, and to set aside and annul an alleged nuncupative will of said deceased, and a decree of the superior court of the state of Washington, for King county, admitting the same to probate.

C. H. Farrell and Piles, Donworth & Howe, for complainants.

W. F. Hays, Joseph W. Robinson, and J. P. Houser, for defendant Marie Carrau.

HANFORD, District Judge. This case involves a controversy as to who shall succeed to the title and enjoyment of an estate amounting in value to, probably, $500,000, left by John Sullivan, who died in the city of Seattle, September 26, 1900, which estate is now in the custody of the defendant Terence O'Brien, under an appointment as administrator by the superior court of the state of Washington for King county. The administrator makes no controversy with any of the claimants, and this case is defended only by Marie Carrau, who claims the entire estate under a nuncupative will alleged to have been made by the deceased in her favor, and which, by a decree of the superior court, was admitted to probate, as the last will and testament of the deceased, on the 8th day of March, 1901.

At every stage of the proceedings, the defendant Marie Carrau has disputed the jurisdiction of this court to take cognizance of this case for any purpose. Her objections have been overruled by the court, and still, in their argument upon the final hearing, her solicitors have made an elaborate argument, maintaining that the department of the superior court which has jurisdiction of probate matters has the ex-

clusive jurisdiction of all questions litigated in this case, and that a federal court is not authorized to encroach upon that jurisdiction; and that this court cannot proceed to determine any of the questions involved because persons not appearing or represented in the case claim to be interested in the estate, and they are indispensable parties; and that a court of equity cannot take cognizance of a proceeding to determine questions as to the genuineness or validity of an alleged will of a deceased person; and that, even if this court has jurisdiction of this case, it can be at most only concurrent with the jurisdiction of the superior court, and, as this case was not commenced until after the initiation of proceedings in the superior court, the final judgment and decree of that court must prevail, and have controlling effect, in the final determination of all matters involved, and therefore this cause should be dismissed because it is a useless and vexatious proceeding.

Referring to the last of the several propositions supported by defendant's argument, it is enough to say that in a case of which, by the constitution and laws of the United States, this court is given jurisdiction concurrent with the jurisdiction of a state court, the parties have an absolute right to invoke that concurrent jurisdiction, and this court has no right to refuse them a hearing because of the pendency of a prior suit in a state court, between the same parties, for the same cause of action. It was so determined, and the law settled, by the decision of the supreme court of the United States, in the case of Stanton v. Embry, 93 U. S. 548, 558, 23 L. Ed. 983.

All the other propositions have also been passed upon, and decided adversely to the contentions of the defendant, by the supreme court of the United States, and by the circuit court of appeals for the Ninth circuit; and, as the courts of last resort have settled the law, it would be unbecoming for this court to discuss the questions further. Every point made in the defendant's argument has been squarely met and fully answered by the opinions in the cases of Payne v. Hook, 7 Wall. 425, 19 L. Ed. 260; Gaines v. Fuentes, 92 U. S. 10, 22, 23 L. Ed. 524; Byers v. McAuley, 149 U. S. 608, 621, 13 Sup. Ct. 906, 37 L. Ed. 867; Richardson v. Green, 9 C. C. A. 565, 61 Fed. 423, 436; Id., 159 U. S. 264, 15 Sup. Ct. 1042, 40 L. Ed. 142. Later decisions of the supreme court have been cited, showing only that general principles have been applied to facts entirely different from this case; and it is contended that the same general principles, if applied, must exclude this case from the jurisdiction of this court. But the cases which are in point have not been overruled, and this court will not discuss the question whether they ought to be overruled or not.

There is another preliminary question to be disposed of before proceeding to a consideration of the case on its merits. The complainants claim to be first cousins and next of kin to the deceased, John Sullivan, who was an Irishman by birth, and, to obtain evidence with respect to their relationship to the deceased, the court issued an open commission, authorizing the examination of witnesses in Ireland who might be called by either party, and, after the return of the commission with the depositions taken thereunder, the defendant Marie Carrau made an application to the court for a new commission to issue for the purpose of examining other witnesses to disprove the

claims of the complainants, which application was supported by affidavits and opposed by counter affidavits. After hearing the matter, the court filed a written memorandum of its decision, which was in part as follows:

"In support of the application now made for a commission to take depositions on interrogatories, an affidavit has been filed by Marie Carrau, stating, upon information and belief, that certain persons residing in Ireland can give testimony material to the issue, and tending to disprove the claims of the complainants, and alleging that the witnesses were not known, and their evidence was not discovered, until after the return to this court of the commission heretofore issued for the taking of depositions in Ireland. * * * In this case, a valuable estate appears to be without an owner, and the prize is a strong temptation to set up claims which may be unfounded in fact and law. The court should proceed with caution and deliberation, and I am inclined to allow ample latitude for the introduction of material evidence brought forward in good faith. I consider, however, that, in view of the opportunities which Marie Carrau has already failed to improve, for obtaining the testimony of witnesses named in her affidavit, that an application such as she now makes to the court should be supported by a strong showing, including affidavits of the proposed witnesses, setting forth substantially such material facts as may be within their knowledge, and certified copies of the records, if there are any, which may tend to prove or disprove the claims of the complainants with respect to their relationship to the deceased, John Sullivan. The present application will be denied, but I will grant leave to renew it if, with reasonable promptness, such supporting evidence and certified records shall be offered. If that is done, counsel may expect that the court will order an open commission to issue for a full examination and cross-examination, and the applicant will be required to deposit in court the sum of $500.00 to reimburse the complainants' counsel who may be employed in Ireland, or sent from Seattle to attend the examination of the witnesses."

Acting upon the intimation of the court in the quoted part of the above-mentioned memorandum, the defendant has renewed her application for a second commission to issue, supported by a showing of the new evidence obtainable, and upon the hearing thereof the court made an order, pro forma, denying the renewed application; reserving, however, the right to make a different order if, upon consideration of the evidence on the final hearing, it should then appear to the court that, in fairness to the parties and to promote the ends of justice, an opportunity should be given to obtain the new evidence. Having given due consideration to the showing made, the arguments of counsel, and the entire evidence in the case, I have now reached a definite conclusion; and it is my opinion now that another commission should not be issued, for the reason that it would be a useless burden upon the parties. It is my opinion that each of the witnesses to be examined if the commission should issue, and all the record evidence shown to be obtainable, would make as much for as against the complainants, and would not change the result in any particular.

One of the proposed witnesses, John Cotter, shows by his affidavit that he is clerk of the district council and of the board of guardians of Cork, Ireland, and that a record in his keeping shows that Bridget Callaghan, a widow, mendicant, 30 years of age, Timothy Callaghan, 10 years, and Johanna Callaghan, 6 years, of age, were all admitted to the workhouse December 9, 1848, and that Bridget died May 1, 1849, and shows nothing as to what became of the two children.

There is nothing in this record, excepting the place where it exists and the similarity of names, to connect it in any way with the complainant Hannah Callaghan. It is not a record of such absolute verity as to prove the church record, showing the dates of the baptism of complainant Hannah Callaghan in the year 1837, of the marriage of her parents in the year .1830, and of the baptism of her mother in the year 1804, to be erroneous, nor would it prove that, notwithstanding the disparity in ages, the Bridget Callaghan and Johanna Callaghan who were in the workhouse in 1848 and 1849 are the same Hannah Callaghan, the complainant in this case, and her mother, Bridget Callaghan. As a mere scrap of evidence, unconnected with any material fact in the case, it can have no influence whatever in shaping a decision. The affidavit of James J. Mooney, clerk in the office of Wynne & Wynne, lawyers, of Cork, shows that when John Sullivan, deceased, a few months before his death, was in Cork, attending to the business of administering upon the estates of his two deceased sisters, he, Sullivan, told Mooney that if he had any relatives in Cork he would give them the money, and also said that he had made a visit to Evergreen, looking for any of his friends, but he met none there, and that he did meet a person who claimed relationship, but the claim was repudiated. The affidavit states no fact connecting the person whose claim of relationship was repudiated by deceased with either one of the complainants, nor with any witness who has testified for them, and it is of no more value as evidence in the case than other declarations of Sullivan, proved by the testimony of J. C. Floyd and others, denying that he had any relatives living, or that he had any knowledge of any living relatives, at a time when, according to the incontestable evidence in the case, his father and mother and two sisters were in fact living in the place where he had left them. The most important part of the affidavit of Eugene F. Collins, solicitor, of Dublin, another of the proposed witnesses, relates to the conduct of the attorneys for the complainants, showing that Mr. Collins accepted a "small fee" for exhibiting to Mr. Wright and Mr. Farrell, representing the complainants, certain original letters written by John Sullivan to Mrs. Lyons of Belfast, and to himself, and that, contrary to promises made by Wright and Farrell, and afterwards by Mr. Howe, one of the solicitors for the complainants, the letters of Mr. Sullivan were not introduced in evidence under the commission for taking testimony in Ireland, nor returned to him. This testimony might be very important if the Sullivan letters referred to had been obtained for the purpose of suppressing material evidence in this case, but, as a matter of fact, the letters are all accounted for. They were brought to Seattle, the handwriting of Mr. Sullivan proved, and were introduced in evidence as a link in the chain of circumstances tending to identify the deceased, John Sullivan, as the son of Peter Sullivan and Abbie, or Abina, Sullivan, née McAuliffe. To the affidavit of Mr. Collins, there is also attached a copy of the census returns for the years 1841 and 1851, which shows that in the year 1841 there was a family residing in Crone's Lane, consisting of Peter Sullivan, aged 31 years, Abbie, aged 30 years, Elizabeth, 7–6 years, Ellen 4–6 years, and John, 1 year, and that the same family were still living there 10 years later; the

ages then being stated as follows: Peter Sullivan 40 years, Abbie 40, Eliza 17, Ellen 15, and John 12. The only possible value which this record can have as evidence in the case is to corroborate the other testimony tending to prove that the John Sullivan whose estate is in controversy in this case was in fact a son of Peter and Abbie Sullivan, who, at the time of his birth, in the year 1840, lived in Crone's Lane, Cork, Ireland. The use which counsel for the defendant think they can make of this record is to rebut the evidence in the case tending to prove that the complainant Hannah Callaghan lived as a member of the family of Peter and Abbie Sullivan from the time of the death of her mother, Bridget Callaghan, until the death of Peter Sullivan, in the year 1873, and that she carried Peter Sullivan's breakfasts to him in the year 1848. But this is not a matter of great importance, for, conceding that the census returns in Ireland are infallibly accurate, this evidence would only prove an error in Hannah Callaghan's testimony as to the time when she became a member of the Sullivan family, and it would not rebut the testimony of the 15 disinterested witnesses, all relatives and neighbors of the family, who have testified that Hannah Callaghan did live for many years in the family, and was reputed to be and recognized as a niece of John Sullivan's mother. If Hannah Callaghan was three years out of the way in her evidence as to the time when she went to live with the Sullivans, that variance from the truth is not more serious than the transparent errors in Mr. Collins' affidavit. He describes himself as a person 21 years of age, although his own letters, which he seems anxious to introduce into the case, show that he was a solicitor in Dublin in the year 1896. He also swears that the first of John Sullivan's letters to him contained a statement that "there were no relatives of his sister alive; that he was her only relative." The letter is in evidence, and it contains no denial of other relatives. The following is what John Sullivan did write to Collins: "My deceased sister, Ellen, who was married, had no children; I am her only heir."

Justice requires that the decision of an important cause should rest upon something more substantial than mere errors or discrepancies, in the testimony of human witnesses, as to unimportant details. If witnesses were to be impeached by mere inaccuracies in their testimony, I would feel obliged to reject the affidavit of Mr. Collins entirely, and if the census returns are infallible, and if Hannah Callaghan did not live with the Sullivan family, as she claims, they must show where she did live, and I have a right to presume that a witness interested and anxious to defeat the complainants in this case, as Mr. Collins shows himself to be, would, if he could do so, bring to the attention of the court substantial and important facts, instead of incumbering the case with records which are not at all relevant unless for the purpose of proving a mere inaccuracy in the testimony.

Mr. Collins also wants to contribute his mite towards proving that Mr. Sullivan, in the year that he died, made declarations disowning his kindred. This evidence, as I have already remarked, is not good to overcome the positive testimony of those who show that they were in a position to know, and did know, Sullivan in his infancy, and did know his parents, sisters, and the complainants during many years,

and associated with them as neighbors, and dealt with them in different ways. The affidavit of Mrs. Lyons of Belfast shows that Bessie Sullivan, sister of John Sullivan,—who is, no doubt, the identical "Elizabeth" and "Eliza" Sullivan referred to in other parts of the testimony and the proposed testimony,—was a domestic servant in her house for 20 years or more, and she never heard mention of Hannah Callaghan or Edward Corcoran, or any one else as relatives of Bessie, excepting her own sister and brother John. Mere negative testimony of that sort is more wearisome than advantageous to the party offering it. It is not hard to imagine that Bessie Sullivan, by refraining from introducing her poor relatives to her mistress, may by her forbearance in that respect have won consideration which materially enhanced the value of her services. Mere selfishness on her part, corresponding to the trait of character in John Sullivan which caused him to deny to his friends in this country that he had relatives or friends in Ireland, at a time when his father and mother and sisters were living there, would not have a feather's weight in opposition to the positive testimony of unimpeached witnesses to the contrary. Mrs. Lyons did not know Sullivan personally until he revisited his native land a few months before his death, and her affidavit shows that, during the few days which he spent as a visitor at her house, she learned nothing of a positive nature with reference to his relatives. A few letters had been written previous to that time by Sullivan to Mrs. Lyons, and to her husband, and they had written to him. But it is unnecessary for Mrs. Lyons to be a witness in order to prove the letters. They are in the case, and they speak for themselves. In their argument, counsel for Marie Carrau attach considerable importance to the testimony Mrs. Lyons may give to contradict a statement by Hannah Callaghan to the effect that years ago she called upon Mrs. Lyons at her house, and requested her, when writing to John Sullivan at Seattle, to give him her regards, saying that John Sullivan would know who Hannah Callaghan was; but her affidavit shows that the only positive testimony which Mrs. Lyons can give relating directly to that matter would tend to corroborate Hannah Callaghan. She says:

"I have a recollection on one occasion, many years ago, of some one speaking to me on the street, in Cork, and asking me to send a kind message, or words to that effect, to said John Sullivan. The person who spoke to me was a very respectable looking woman, who lived, I think, in Sunday's Well, Cork, but, having heard the description of the present claimant, I do not believe she could be the same person,—that is, of course, assuming the description I received as correct, namely, that Hannah Callaghan is a beggar woman in Cork, and of intemperate habits, and has been so for years."

According to this statement, it is true that Mrs. Lyons was requested to send a message similar to that referred to in Hannah Callaghan's testimony, it was a woman who made the request, and it was many years ago. The only important difference between her statement and that of Mrs. Lyons is that the request was made at Mrs. Lyons' house instead of upon a street in Cork. Hannah Callaghan claims that she was the woman who made the request. Mrs. Lyons certainly cannot contradict her, because she does not know the per-

son who made the request, and she does not know Hannah Callaghan, but only supposes the request to have been made by a different person because it was made by a "respectable looking woman"; and certainly she cannot testify now that Hannah Callaghan was not at that time a respectable looking woman, and does not propose to do so except by injecting into the case second-hand and hearsay reports that Hannah Callaghan is and has been for years a beggar woman of intemperate habits. It seems to me the court should not be called upon to spend time in giving serious consideration to a mere supposition based upon hearsay. The only other matters of any importance contained in the affidavits and correspondence in support of this application are explanations by Collins and Donagan, who were employed to represent Marie Carrau in taking evidence under the original commission, of their reasons for not securing additional testimony at that time, one excuse being that they expected counsel for complainants to call as witnesses and examine some of the very persons who are now brought forward as witnesses adverse to the complainants; and another excuse is that they were disappointed in not receiving the amount of money which they demanded from Mr. Hays, solicitor for Marie Carrau, for their services and contemplated expenses to be incurred in her interest. Upon the showing made, the court cannot do otherwise than confirm the order heretofore made denying this application.

Passing, now, to the consideration of the merits of the case, I hold that it is necessary for persons residing in a distant land, claiming a valuable estate situated here, as collateral heirs of the decedent, to make out their case by convincing proof, and that the court should be cautious in reaching a conclusion favorable to the claims of these plaintiffs. But, after reading and pondering over the depositions taken in Ireland, and the exhibits, and the few scraps of testimony obtained from witnesses who knew John Sullivan during the years of his residence in Seattle, I am obliged to say that the complainants have done more than to simply bring forward evidence justifying a surmise that they may be the nearest living relatives of the deceased. Their case rests upon positive and direct testimony corroborated in so many different ways that I must yield to the belief which it creates. I cannot say that the combination of facts and circumstances proved makes a case entirely free from any flaw. That would be impossible. But the few discrepancies and apparent defects are such as naturally arise from the proneness of human beings to commit errors, and do not destroy the fabric. I deem it unnecessary to rehearse the testimony, which is voluminous, or to comment on particular portions of it. It is enough to say that I am convinced by it that each of the complainants bore the relation to John Sullivan of first cousin, they being a son and a daughter of different sisters of John Sullivan's mother, Abbie Sullivan, née McAuliffe, and that when Sullivan died there was not then living any other kindred of his of a closer degree. It is proved conclusively that Sullivan died without ever having been married; that he left surviving him no issue, nor father, nor mother, nor brother, nor sister, nor child or children of any deceased brother or sister, nor brother or sister of either of his parents. The decree

to be rendered will establish finally that the complainants are entitled, as the next of kin and heirs of John Sullivan, to share in the distribu-, tion of his estate, but will not pronounce that they are the only heirs, nor assume to dispose of the claims of persons, not parties to this suit, if there are any such, entitled to share in the distribution of the estate, as relatives of the deceased, in the same degree as the complainants.

By proving that they are heirs, and interested in the estate, these complainants have gained a standing entitling them to controvert the claims of Marie Carrau as to the genuineness and validity of the alleged nuncupative will. I have reached a conclusion that makes it unnecessary for me to express an opinion upon the questions which have been debated as to the right of an owner of real and personal property, under the statutes of this state, to make a testamentary disposition of the same by a nuncupative will. This court has been asked to decide that certain statutes making changes in the original statute of Washington Territory, enacted in the year 1854, relating to wills, are void, but the court is not obliged to take the responsibility of declaring statutes which have been formally enacted and promulgated to be null and void when the justice of the case does not require it.

The lawful heirs of a deceased person should not be disinherited by a nuncupative will unless the prescribed forms of law for establishing such a will are carefully observed, and strictly conformed to, nor unless it be proved to be genuine by evidence strong enough to create a belief in an unbiased and receptive mind that the necessary words were spoken with an intent thereby to make a testamentary disposition of the testator's property. Having that principle in mind, the evidence in this case falls short of meeting the requirements. All the evidence in the case which in any way tends to prove the will consists of the testimony of Marie Carrau, the beneficiary, and three of her nearest relatives. They all testified exactly alike as to the precise words spoken by Sullivan. They all testified exactly alike to the fact that they understood Mr. Sullivan to mean by those words that he had previously made a will giving all his property to Marie, and they all made exactly the same corrections afterwards, claiming that they understood, when the words were spoken, that Mr. Sullivan intended then, and by those words, to make a will; that what he said was the real will. The value of this testimony is certainly impaired by these circumstances.

It is my opinion that the evidence is not sufficient to prove that the words constituting the alleged nuncupative will were in fact ever spoken by John Sullivan, and even if they were spoken, and intended by Sullivan to have the effect of conveying his entire estate to Marie Carrau, still by reason of failure to comply with the requirements of the statute, by offering proof to sustain it within the time limited for that purpose, and in the manner prescribed, the court cannot lawfully give effect to it as a valid will. This is what the law prescribes with reference to the proof of a nuncupative will:

"No proof shall be received of any nuncupative will, unless it be offered within six months after speaking the testamentary words, nor unless the words, or the substance thereof, be first committed to writing, and a citation issued to the widow or next of kin of the deceased, that they may con-

test the will if they think proper." Section 4606, 1 Ballinger's Ann. Codes & St.

In order to fairly interpret this statute, and understand what it requires, it is proper to consider that in the English system, from which our practice has been derived, there were two methods of proving wills. The "common form" was an ex parte proceeding by which the court, upon presentation of a will, in the absence of the parties interested, received formal proof, and the will was immediately probated, but the record thereof was not even legal evidence to affect the title to real estate; and a will probated in that manner remained subject to be proved again, in an adversary proceeding, if any interested party demanded it within 30 years. The other method, called "the solemn form," required the issuance and service of a citation calling upon the parties whose rights may be affected to appear and contest the will, and the proceedings included the examination of witnesses to sustain the will, and the introduction of other evidence by the respective parties, in the same manner as in other adversary proceedings. 16 Enc. Pl. & Prac. 993, 994; Richardson v. Green, supra. The statutes of the territory and state of Washington adopt the "common form" of proceeding for probating an ordinary will; the effect of admitting a will to probate in that manner being merely to make it a public record, challenging the attention of interested parties for a period of one year, when it becomes absolutely binding upon all parties if no proceedings to contest its validity have been taken in the manner prescribed. 2 Ballinger's Ann. Codes & St. §§ 6100, 6112. But the legislature, for obvious and sufficient reasons, adopted the other method for establishing a nuncupative will, as shown by the section above quoted. As the words indicate, the law is mandatory, and prescribes that proof to establish such a will shall not be received unless offered within six months after the time of uttering the words constituting such a will, and that a citation must be issued to the widow or next of kin of the deceased, that they may contest the will if they deem it proper to do so. The citation must, in reason, contain a notice of a time and place for the persons to whom it is addressed to appear, and it must be served, or knowledge of its contents must be communicated, in time to afford a reasonable opportunity to exercise the right which the law intended to guard. A citation designating a time already past before it was issued is but a mockery of that fair and orderly method of procedure which the law intended to prescribe, and it must be regarded as no citation. Without a lawful citation being issued and served, the superior court had no jurisdiction to hear proof in support of the alleged nuncupative will. The record shows that the superior court, instead of observing the plain and reasonable requirements of this law, made an order for a citation to issue immediately upon receiving the petition of Marie Carrau to admit the alleged will to probate, and under that order a formal citation was immediately issued, fixing the time for the widow or next of kin to appear, for the purpose of contesting the alleged will, on the same day on which the petition was presented, and at an hour of the day then already past. This paper was then immediately placed in the hands of the sheriff, and was immediately returned to the court with his indorsement there-

on that he was not able to find any widow or next of kin of the deceased, John Sullivan, within King county, and the court thereupon proceeded to hear the testimony of the witnesses, signed a certificate authenticating a typewritten transcript of the testimony, prepared beforehand, and entered a decree accepting the will for record as the genuine last will and testament of John Sullivan, deceased. For its failure to issue a lawful citation, the superior court acted without jurisdiction in hearing proof of this alleged will, and the case stands exactly as if no proof had been offered within the time limited, and the decree of the court probating the will was and is an absolute nullity.

The complainants may take a decree in accordance with this opinion.